STATE of Minnesota, Appellant,

v.

Melissa Jean CRAWLEY, Respondent.

No. A09–1795.

Supreme Court of Minnesota.

Aug. 8, 2012.

Lori Swanson, Attorney General, St. Paul, MN; and Karin L. Sonneman, Winona County Attorney, Stephanie E. Nuttall, Assistant Winona County Attorney, Winona, MN, for appellant.

John M. Stuart, Minnesota State Public Defender, St. Paul, MN; and Scott M.

Flaherty, Briggs and Morgan, P.A., Minneapolis, MN, for respondent.

Lori Swanson, Attorney General, John S. Garry, Assistant Attorney General, St. Paul, MN, for amicus curiae Minnesota Attorney General.

Cort C. Holten, Jeffrey D. Bores, Chestnut Cambronne PA, Minneapolis, MN, for amicus curiae Minnesota Police and Peace Officers Association.

Teresa Nelson, American Civil Liberties Union of Minnesota, St. Paul, MN; and Sarah Riskin, Nadege J. Souvenir, Rachel Bowe, Maslon Edelman Borman & Brand, LLP, Minneapolis, MN, for amicus curiae American Civil Liberties Union.

OPINION

ANDERSON, G. BARRY, Justice.

The question presented here is whether a Minnesota statute that prohibits knowingly false reports of police misconduct violates the First Amendment because it allows the State to punish some people, but not others, depending on the viewpoint expressed about the police. A jury found Melissa Jean Crawley guilty of violating the challenged law, Minn.Stat. § 609.505, subd. 2 (2010), based on the fact that she informed a police officer that another officer forged her signature, knowing that the information conveyed was false. The court of appeals reversed her conviction after concluding that section 609.505, subdivision 2, is unconstitutional because it criminalizes false speech "critical" of the police but not false speech that favors the police. State v. Crawley, 789 N.W.2d 899, 910 (Minn.App.2010). Because we narrowly construe section 609.505, subdivision 2, to criminalize only defamatory speech not protected by the First Amendment, and because the statute falls within two of the exceptions to the constitutional prohibition against content discrimination in an unpro-

tected category of speech, we reverse the court of appeals' judgment that the statute is unconstitutional. Because Crawley's conviction under section 609.505, subdivision 2, preceded our narrow construction of the statute, due process considerations entitle her to a new trial. We therefore reverse her conviction and remand for a new trial based on our narrowing construction of the statute.

On April 17, 2008, Melissa Jean Crawley went to the Winona County Law Enforcement Center, met with Winona Police Department Sergeant Christopher Nelson, and informed Nelson that a police officer had forged her signature on a medical release form at a Winona hospital. Nelson asked Crawley who she thought had forged her signature. Crawley noted that the form was signed "Melissa Crawley at 0600 hours," and informed Nelson that "it has to be a police officer that did that. I don't sign things and date them 0600 hours." The release related to treatment Crawley received at the hospital for injuries sustained in an assault that Winona police were investigating, and Crawley informed Nelson she thought her signature was forged by "the police officer who requested the records, whoever was doing the investigation."

Nelson investigated Crawley's report. During his investigation, Nelson spoke to a nurse who told Nelson that she saw Crawley sign the release while Crawley was at the hospital. The State charged Crawley on April 30, 2008, with falsely reporting an act of police misconduct, Minn.Stat. § 609.505, subd. 2(a)(2), and falsely reporting a crime, Minn.Stat. § 609.505, subd. 1

(2010).[1] Subdivision 2, the statutory provision at issue in this appeal, provides:

(a) Whoever informs, or causes information to be communicated to, a peace officer, whose responsibilities include investigating or reporting police misconduct, that a peace officer, as defined in section 626.84, subdivision 1, paragraph (c), has committed an act of police misconduct, knowing that the information is false, is guilty of a crime and may be sentenced as follows:

(1) up to the maximum provided for a misdemeanor if the false information does not allege a criminal act; or

(2) up to the maximum provided for a gross misdemeanor if the false information alleges a criminal act.

(b) The court shall order any person convicted of a violation of this subdivision to make full restitution of all reasonable expenses incurred in the investigation of the false allegation unless the court makes a specific written finding that restitution would be inappropriate under the circumstances. A restitution award may not exceed $3,000.

Crawley moved to dismiss the charge under subdivision 2(a)(2). In her motion to dismiss, Crawley relied wholly on *Chaker v. Crogan*, 428 F.3d 1215 (9th Cir.2005). In *Chaker*, the United States Court of Appeals for the Ninth Circuit held that a California statute, Cal. Penal. Code § 148.6, criminalizing knowingly false reports of police misconduct violated the First Amendment for targeting "only knowingly false speech *critical* of peace officer conduct during the course of a com-

---

1. Minnesota Statutes § 609.505, subd. 1, provides:

Whoever informs a law enforcement officer that a crime has been committed or otherwise provides information to an on-duty peace officer, knowing that the person is a peace officer, regarding the conduct of oth- ers, knowing that it is false and intending that the officer shall act in reliance upon it, is guilty of a misdemeanor. A person who is convicted a second or subsequent time under this section is guilty of a gross misde- meanor.

plaint investigation," but not "[k]nowingly false speech *supportive* of peace officer conduct." 428 F.3d at 1228. The Winona County District Court denied the motion to dismiss and, after a trial, a jury found Crawley guilty of both counts. The district court concluded subdivision 1 was a lesser included offense of subdivision 2(a)(2), convicted Crawley of subdivision 2(a)(2), and sentenced her to 15 days in jail.

Crawley appealed her conviction to the Minnesota Court of Appeals. In a divided decision, the court of appeals reversed Crawley's conviction and remanded the case for sentencing on the subdivision 1 verdict. *Crawley*, 789 N.W.2d at 910. The majority of the court categorized the speech at issue as an "intentional lie" that was not protected by the First Amendment. *Id.* at 903 (emphasis omitted). The majority stated that "even though intentional falsehoods are subject to regulation, the government cannot pick and choose which falsehoods to prohibit so as to crimi-

nalize certain false statements but not others based on the content of the speech or viewpoint of the speaker." *Id.* at 904. The majority concluded that subdivision 2 violates the First Amendment because it criminalizes "false critical information" but not "false exonerating information," contrary to the prohibition on viewpoint discrimination announced in *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). *Crawley*, 789 N.W.2d at 910. The court of appeals dissent, on the other hand, concluded that the statute targeted speech within the unprotected category of defamation, not simple "lies." *Id.* (Harten, J., dissenting) (emphasis omitted). The dissent reasoned that, when viewed as a regulation of defamation, section 609.505, subdivision 2, comes within the exceptions to the *R.A.V.* prohibition on content discrimination. *Crawley*, 789 N.W.2d at 911–12 (Harten J., dissenting). The State sought further review,[2] which we granted.[3]

2. Crawley does not challenge the constitutionality of Minn.Stat. § 609.505, subd. 1. Our review is therefore limited to section 609.505, subdivision 2.

3. The State and amicus curiae Minnesota Attorney General ask us to limit our review to section 609.505, subdivision 2(a)(2), the subparagraph that addresses knowingly false reports of police misconduct that allege the officer committed a crime, rather than review subdivision 2 as a whole. (Subdivision 2 also includes subparagraph (a)(1), which applies to false reports of police misconduct in which the alleged act of misconduct is not a crime.) Crawley and amicus curiae American Civil Liberties Union of Minnesota oppose a limited review, arguing that the statutory text implicating the First Amendment—"[w]hoever informs, or causes information to be communicated, to a peace officer … knowing that the information is false, is guilty of a crime"—is within paragraph 2(a), which is antecedent to and applies to both subparagraphs (a)(1) and (a)(2).

We will not limit our review as requested by the State and amicus Minnesota Attorney

General. In the statement of the case Crawley filed in the court of appeals, she identified the legal issue in her appeal as whether the district court erred "in failing to conclude that Minnesota Statutes section 609.505, subdivision 2, constitutes a viewpoint- and content-based restriction that violates the First Amendment." In its brief to the court of appeals, the State argued that review should be limited to subdivision 2(a)(2), a limit that Crawley opposed as she does here. The court of appeals addressed the entirety of subdivision 2 in its decision. *Crawley*, 789 N.W.2d at 902, 910. When the State sought our review, it identified in its petition that the legal issue here was whether "subdivision 2" violates the First Amendment. Moreover, the Legislature added subdivision 2 in its entirety to section 609.505 in the same law, *see* Act of June 2, 2005, ch. 136, § 30, 2005 Minn. Laws 901, 1138, making its whole text relevant to our review. *See generally Christensen v. Dep't of Conservation, Game & Fish*, 285 Minn. 493, 499–500, 175 N.W.2d 433, 437 (1970) (construing statutory language in context of act that contains it). Finally, we note that the

We begin by noting certain principles of First Amendment law that will frame our discussion of this case. Content-based restrictions of speech[4] are presumptively invalid, *R.A.V.*, 505 U.S. at 382, 112 S.Ct. 2538, and ordinarily subject to strict scrutiny, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). But the Supreme Court "ha[s] long recognized that the government may regulate certain categories of expression consistent with the Constitution." *Virginia v. Black*, 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). As explained recently by the Supreme Court in *United States v. Stevens*:

> From 1791 to the present, . . . the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never included a freedom to disregard these traditional limitations. These historic and traditional categories long familiar to the bar . . . include[d] obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. . . .

— U.S. ——, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010) (citations omitted) (internal quotation marks and alterations omitted). Categories of speech such as obscenity and defamation that may be restricted without violating the First Amendment are often called "unprotected speech," *R.A.V.*, 505 U.S. at 406, 112 S.Ct. 2538, and can, "consistently with the First Amendment, be regulated because of their constitutionally proscribable content." *Id.* at 383, 112 S.Ct. 2538 (emphasis omitted). But these unprotected categories of speech are not "entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content." *Id.* at 383–84, 112 S.Ct. 2538. Thus, the government is prohibited from discriminating on the basis of content within unprotected categories of speech unless one of the exceptions set forth in *R.A.V.* apply. *Id.* at 388–90, 112 S.Ct. 2538

Following this framework, in Part I of this opinion, we conclude that section 609.505, subdivision 2, is a content-based regulation of speech. In Part II, we construe section 609.505, subdivision 2, narrowly and conclude that the statute punishes only speech that meets the Minnesota definition of defamation, an unprotected category of speech. In Part III, we evaluate the statute under the constitutional rule that prohibits the State from drawing distinctions based on content within an unprotected category of speech. Finally, in Part IV, we conclude that under our narrowing construction, section 609.505, subdivision 2, is constitutional.

---

court of appeals has since relied on its decision in *Crawley* to reverse at least one conviction in an order opinion that addresses only subdivision 2. *State v. Farkarlun*, No. A09–2092, Order at 2 (Minn.App. filed Dec. 13, 2010), *rev. stayed* (Minn. Feb. 15, 2011).

Given the record on appeal, the decision of the court of appeals holding subdivision 2 unconstitutional, and the fact that the constitutionality of subdivision 2 is an important question with statewide impact that is likely to recur until we resolve it, *see* Minn. R. Civ.App. P. 117, subd. 2(a), (b), (d), we address the entirety of section 609.505, subdivision 2, in this opinion.

4. Content-neutral time, place, and manner restrictions, on the other hand, are subject to a less exacting standard of review: "[Reasonable time, place, or manner restrictions] are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

## I.

■ The constitutionality of a statute presents a question of law, which we review de novo. *State v. Cox,* 798 N.W.2d 517, 519 (Minn.2011); *State v. Melde,* 725 N.W.2d 99, 102 (Minn.2006). In this case, the court of appeals held that section 609.505, subdivision 2, criminalizes the "intentional lie." *State v. Crawley,* 789 N.W.2d 899, 903 (Minn.App.2010) (emphasis omitted). The court of appeals determined that the intentional lie is one type of expression that is subject to regulation, since it "fails to 'materially advance[ ] society's interest in uninhibited, robust, and wide-open debate on public issues.'" *Id.* (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). Nevertheless, the court of appeals concluded that the statute is facially unconstitutional because it exposes some speakers but not others to criminal sanction based on the speaker's expressed viewpoint regarding the police. *Id.* at 905 ("The provision challenged in this case punishes only those known falsehoods that are *critical* of police conduct."). Crawley asks us to affirm, arguing that the statute impermissibly discriminates against "a certain class of anti-government speech" while permitting an otherwise "similarly situated class of pro-government speech" to go unpunished. To address Crawley's

argument, we must first determine whether section 609.505 is a content-based regulation of speech.

Section 609.505, subdivision 2, criminalizes knowingly false reports of police misconduct. Neither party disputes that the statute regulates speech. But while Crawley contends that the statute impermissibly discriminates on the basis of content, and even viewpoint,[5] the State argues that the statute is a content-neutral time, place, and manner restriction. We conclude that section 609.505, subdivision 2, is a content-based regulation of speech because whether a person may be prosecuted under the statute depends entirely on what the person says. *See Holder v. Humanitarian Law Project,* —— U.S. ——, 130 S.Ct. 2705, 2712, 2723–24, 177 L.Ed.2d 355 (2010) (concluding a law that made it a crime to "knowingly provid[e] material support or resources to a foreign terrorist organization" regulated speech based on its content because whether plaintiffs could speak without sanction "depends on what they say").

## II.

■ Because section 609.505, subdivision 2, is a content-based regulation of speech, we must determine if the statute, as written, criminalizes only unprotected speech.[6] *See United States v. Stevens,* ——

---

**5.** Crawley argues that subdivision 2 discriminates on the basis of viewpoint because it criminalizes false critical information but not false exonerating information. In *Morse v. Frederick,* 551 U.S. 393, 436, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (Stevens, J., dissenting), Justice Stevens noted that "censorship that depends on the viewpoint of the speaker" is "subject to the most rigorous burden of justification":

> Discrimination against speech because of its message is presumed to be unconstitutional.... When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of

the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

(citation omitted) (internal quotation marks omitted). We address whether section 609.505, subdivision discriminates on the basis of viewpoint in Part III.

**6.** The court of appeals held that section 609.505, subdivision 2, criminalizes the "intentional lie." *State v. Crawley,* 789 N.W.2d

U.S. ——, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010) (traditional categories of unprotected speech "long familiar to the bar" include obscenity, defamation, fraud, incitement, and speech integral to criminal conduct). If the statute, as written, criminalizes a substantial amount of protected speech in addition to unprotected speech, we must then determine if we can uphold the statute's constitutionality by construing it narrowly to reach only unprotected speech.

To be a constitutional exercise of the police power of a state, a statute that punishes speech must not be overly broad.[7] See Broadrick v. Oklahoma, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). In general, a statute can be said to be overly broad if it prohibits or chills a substantial amount of protected speech along with unprotected speech. See Ashcroft v. Free Speech Coal. 535 U.S. 234, 244, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002). But when possible, we uphold a law's constitutionality by narrowly construing the law so as to limit its scope to conduct that falls outside First Amendment protection while clearly prohibiting its application to constitutionally protected expression. See In re Welfare of S.L.J.,

263 N.W.2d 412, 419 (Minn.1978) (disorderly conduct statute limited to "fighting words" to preserve constitutionality); see also New York v. Ferber, 458 U.S. 747, 769, n. 24, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) ("If the invalid reach of the law is cured [by narrow judicial construction], there is no longer reason for proscribing the statute's application to unprotected conduct.").

We construe statutes de novo. Krummenacher v. City of Minnetonka, 783 N.W.2d 721, 726 (Minn.2010). Our primary objective is to ascertain and give effect to the legislature's intent. Minn. Stat. § 645.16 (2010). We follow the directive that "[w]hen the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit." Id. Ambiguity exists only where statutory language is subject to more than one reasonable interpretation. In re Welfare of J.B., 782 N.W.2d 535, 540 (Minn.2010).

## A.

We begin with the language of the statute. Section 609.505, subdivision 2, provides in relevant part:

899, 903 (Minn.App.2010) (emphasis omitted). The court of appeals further concluded that the intentional lie is subject to regulation because it "is one type of expressive action that fails to 'materially advance[ ] society's interest in uninhibited, robust, and wide-open debate on public issues.'" Id. (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). We disagree. Recent decisions by federal appellate courts have cast serious doubt on the intentional lie or knowingly false speech as a category of unprotected speech. See United States v. Alvarez, —— U.S. ——, 132 S.Ct. 2537, 2545, 183 L.Ed.2d 574 (2012) (plurality opinion) ("[F]alsity alone may not suffice to bring the speech outside the First Amendment."); 281 Care Comm. v. Arneson, 638 F.3d 621, 633–34 (8th Cir.2011) (declining to recognize "knowingly false campaign speech" as categorically unprotected). We thus decline to recognize the intentional lie or knowingly false speech as a category of unprotected speech.

7. The Supreme Court has held that although as applied to a particular defendant an ordinance might be neither vague nor overbroad or otherwise invalid, the defendant could raise its vagueness or unconstitutional overbreadth as applied to others, and an ordinance which was facially unconstitutional could not be applied to the defendant unless a satisfactory limiting construction was placed on the ordinance by state courts. See Plummer v. City of Columbus, 414 U.S. 2, 3, 94 S.Ct. 17, 38 L.Ed.2d 3 (1973) (per curiam).

(a) Whoever informs, or causes information to be communicated to, a peace officer, whose responsibilities include investigating or reporting police misconduct, that a peace officer, as defined in section 626.84, subdivision 1, paragraph (c), has committed an act of police misconduct, knowing that the information is false, is guilty of a crime and may be sentenced as follows:

(1) up to the maximum provided for a misdemeanor if the false information does not allege a criminal act; or

(2) up to the maximum provided for a gross misdemeanor if the false information alleges a criminal act.

Under the statute, in order for a person to be subject to criminal sanctions, he or she must "know[ ]" that the information he or she communicates to a peace officer is false. And the statute specifies the "information" that is actionable: "that a peace officer ... has committed an act of police misconduct."

"[A]ct of police misconduct" has a clear, technical meaning when we turn to other statutes on the same subject, and to applicable rules. *See* Minn.Stat. § 645.08(1) (2010) (requiring that, when Minnesota statutes are construed, "technical words and phrases and such others as have acquired a special meaning ... are construed according to such special meaning or their definition"). First, Minnesota Rules 6700.2000–.2600 (2011) create procedures and guidelines for the investigation, processing, and resolution of misconduct allegations against licensed peace officers.

The rules define "[m]isconduct" as "an act or omission by an employee or appointee of an agency licensed by the board which may result in disciplinary action by the agency or appointing authority." Minn. R. 6700.2000, subp. 3. The model state professional conduct policy, developed by the state Board of Police Officer Standards and Training pursuant to Minn.Stat. § 626.8457, subd. 1, 2, (2010), outlines 35 rules of conduct, including a prohibition against committing a crime while on or off duty. *See* Board of Police Officer Standards and Training, *Professional Conduct of Peace Officers Model Policy* (2011). Considering these provisions, we construe "act of police misconduct" in Minn.Stat. § 609.505, subd. 2, to mean a specific act or omission that violates a policy or rule of professional conduct, adopted by a law enforcement agency, which would expose a peace officer to discipline.

The use of the identical phrase "a peace officer" in section 609.505, subdivision 2, can apply to situations in which the officer who is the subject of the false report is the same officer who is informed about the report. The statute can also apply to situations where the officer who is the subject of the false report is not the same officer who is informed about the report. A peace officer is identified generally by the reference to the statutory definition of "peace officer" at Minn.Stat. § 626.84, subd. 1(c)(1)(2010).[8] Although the two instances of the phrase "a peace officer" are followed by different descriptive clauses— "whose responsibilities include investigat-

8. "Peace officer" means ... an employee or an elected or appointed official of a political subdivision or law enforcement agency who is licensed by the [Board of Peace Officer Standards and Training], charged with the prevention and detection of crime and the enforcement of the general criminal laws of the state and who has the full power of arrest, and shall also include the Minnesota State

Patrol, agents of the Division of Alcohol and Gambling Enforcement, state conservation officers, Metropolitan Transit police officers, Department of Corrections Fugitive Apprehension Unit officers, and Department of Commerce Insurance Fraud Unit officers, and the statewide coordinator of the Violent Crime Coordinating Council....
Minn.Stat. § 626.84, subd. 1(c) (2010).

ing or reporting police misconduct" and "has committed an act of police misconduct"—there is no requirement that a peace officer being informed of the misconduct must be a different person than the peace officer who is accused of committing misconduct in order for the speech to be criminal.

We thus conclude that section 609.505, subdivision 2, as written, makes it a crime for a person to inform a peace officer, whose responsibilities include investigating or reporting police misconduct, that a peace officer, who may or may not be the same peace officer being so informed, committed an act of police misconduct, knowing that the information conveyed is false.

### B.

■■■■■ It is clear that, as written, section 609.505, subdivision 2, is overly broad because it punishes a substantial amount of protected speech in addition to unprotected speech.[9] As explained below, while the statute, as written, criminalizes defamatory speech, which is unprotected under the First Amendment, it also criminalizes a substantial amount of speech that is not defamatory and thus protected speech.

■■■■■ To establish a defamation claim in Minnesota, a plaintiff must prove four elements: he or she must show that the defamatory statement is "communicated to someone other than the plaintiff;"

that "the statement is false;" that the statement tends to "harm the plaintiff's reputation" and to lower the plaintiff "in the estimation of the community," *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919–20 (Minn.2009); and that the recipient of the false statement reasonably understands it to refer to a specific individual, *see Glenn v. Daddy Rocks, Inc.*, 171 F.Supp.2d 943, 948 (D.Minn.2001) (stating, under Minnesota law, that the "of and concerning" element requires the plaintiff in a defamation lawsuit to prove that the statement at issue either explicitly referred to the plaintiff or that a reader "by fair implication" would understand that the statement referred to the plaintiff). "If the defamation affects the plaintiff in his business, trade, profession, office or calling, it is defamation per se and thus actionable without any proof of actual damages." *Bahr*, 766 N.W.2d at 920 (citation omitted) (internal quotation marks and alteration omitted).

Because the statute, as written, does not require knowingly false accusations of police misconduct to be communicated to someone other than the plaintiff in order for the speech to be criminal, the statute fails to fulfill the first element of defamation: publication to a third person. The statute also fails to fulfill the fourth element because it does not require the statement to be "of and concerning" a specific individual. Because the statute does not

---

9.  A statute may be declared facially unconstitutional as overly broad if it prohibits or chills a substantial amount of protected speech along with unprotected speech. *See Ashcroft*, 535 U.S. at 244, 122 S.Ct. 1389. The categories of speech that have been held unprotected by the First Amendment include obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. *See Stevens*, 130 S.Ct. at 1584, 130 S.Ct. 1577. Since section 609.505, subdivision 2, does not criminalize words "which by their very utterance inflict injury or tend to incite an immediate breach

of the peace," the prohibited speech cannot be categorized as "fighting words." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). We also conclude that the speech prohibited by section 609.505, subdivision 2, cannot be categorized as obscenity, fraud, incitement, or speech integral to criminal conduct. But a large portion of the speech prohibited by section 609.505, subdivision 2, can be categorized as defamation, and our analysis proceeds on this basis.

satisfy all of the elements of defamation, it punishes a substantial amount of protected speech and is therefore facially unconstitutional.

■ The United States Supreme Court has recognized that the overbreadth doctrine as "strong medicine" that has been employed "sparingly." *Broadrick*, 413 U.S. at 613, 93 S.Ct. 2908. "Because of the wide-reaching effects of striking down a statute on its face," the Supreme Court has employed the overbreadth doctrine "with hesitation, and then 'only as a last resort.'" *Ferber*, 458 U.S. at 769, 102 S.Ct. 3348 (quoting *Broadrick*, 413 U.S. at 613, 93 S.Ct. 2908). "Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." *Broadrick*, 413 U.S. at 613, 93 S.Ct. 2908. In *In re Welfare of R.A.V.*, we stated

> [T]he complete invalidation of legislatively adopted laws [the overbreadth doctrine] permits is "strong medicine" that this court does not hastily prescribe. Where the overbreadth of the challenged law is both "real" and "substantial," and where "the words of the [law] simply leave no room for a narrowing construction," "so that in all its applications the [law] creates an unnecessary risk of chilling free speech," this court will completely invalidate it. When possible, however, this court narrowly construes a law subject to facial overbreadth attack so as to limit its scope to conduct that falls outside first amendment protection while clearly prohibiting its application to constitutionally protected expression.

464 N.W.2d 507, 509 (Minn.1991) (citations omitted) (*rev'd sub nom. R.A.V. v. City of St. Paul*, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)).

■ Although the statute does not satisfy all of the elements of defamation, we can uphold its constitutionality by construing it narrowly to refer only to defamation. The United States Supreme Court generally allows, and even encourages, state supreme courts to sustain the constitutionality of state statutes regulating speech by construing them narrowly to punish only unprotected speech. For example, in *Chaplinsky*, the Supreme Court upheld a New Hampshire statute as constitutional because the highest court of New Hampshire authoritatively construed the statute to reach only "fighting words." 315 U.S. at 573, 62 S.Ct. 766. The statute at issue in *Chaplinsky* provided: "No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name...." *Id.* at 569, 62 S.Ct. 766 (internal quotation marks omitted). The state court limited the statute's reach to "fighting words" by holding that the statute only prohibited words that "have a direct tendency to cause acts of violence by the persons to whom, individually, the remark is addressed." *Id.* at 573, 62 S.Ct. 766 (citation omitted). In upholding the constitutionality of the statute, the Supreme Court stated:

> We are unable to say that the limited scope of the statute as thus construed contravenes the Constitutional right of free expression. It is a statute narrowly drawn and limited to define and punish specific conduct lying within the domain of state power, the use in a public place of words likely to cause a breach of the peace.

*Id.*

The Supreme Court has also deferred to our authoritative construction of statutes regulating speech. In *S.L.J.*, we examined the constitutionality of the disorderly conduct statute, Minn.Stat. § 609.72, subd.

1(3) (1976).[10] 263 N.W.2d 412. We stated that, as written, section 609.72, subdivision 1(3), was both "overly broad and vague" because it did not satisfy the definition of "fighting words":

> Since the statute punishes words alone—"offensive, obscene, or abusive language"—it must be declared unconstitutional as a violation of the First and Fourteenth Amendments unless it only proscribes the use of "fighting words." Section 609.72, subd. 1(3), however, punishes words that merely tend to "arouse alarm, anger, or resentment in others" rather than only words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Since the statute does not satisfy the definition of "fighting words," it is unconstitutional on its face.

S.L.J., 263 N.W.2d at 418–19. But we went on to hold that although section 609.72, subdivision 1(3) "clearly contemplates punishment for speech that is protected under the First and Fourteenth Amendments, we can uphold its constitutionality by construing it narrowly to refer only to 'fighting words.'" S.L.J., 263 N.W.2d at 419. We noted that the Supreme Court has, in fact, "encouraged state supreme courts to sustain the constitutionality of their offensive-speech statutes by construing them narrowly" to punish only unprotected speech. Id. at 419 n.5 (collecting cases).

Then in In re R.A.V., 464 N.W.2d at 510, we relied on our previous construction in S.L.J. to limit the application of the statute at issue to "fighting words." In In re R.A.V., prior to Supreme Court review, we considered a St. Paul ordinance that made it a misdemeanor to display a symbol, "including but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm, or resentment in others on the basis of race, color, creed, religion, or gender." 464 N.W.2d at 508 (citation omitted). Applying our previous construction in S.L.J., we limited the phrase "arouses anger, alarm, or resentment in others" to punish only unprotected "fighting words," defined as "conduct that itself inflicts injury or tends to incite immediate violence." In re R.A.V., 464 N.W.2d at 510. Although as written, the statute did not satisfy the elements of "fighting words," we narrowly construed it to refer only to "fighting words." Id. On appeal, the Supreme Court deferred to our authoritative construction of the ordinance: "In construing the St. Paul ordinance, we are bound by the construction given to it by the Minnesota court. Accordingly, we accept the Minnesota Supreme Court's authoritative statement that the ordinance reaches only those expressions that constitute fighting words, within the meaning of Chaplinsky." R.A.V., 505 U.S. at 381, 112 S.Ct. 2538 (internal citations omitted).[11]

10. Minnesota Statutes § 609.72, subd. 1 (1976), provided:

> Whoever does any of the following in a public or private place, knowing, or having reasonable grounds to know that it will, or will tend to, alarm, anger or disturb others or provoke an assault or breach of the peace, is guilty of disorderly conduct, which is a misdemeanor:
> (1) Engages in brawling or fighting; or
> (2) Disturbs an assembly or meeting, not unlawful in its character; or

> (3) Engages in offensive, obscene, or abusive language or in boisterous and noisy conduct tending reasonably to arouse alarm, anger, or resentment in others.
> See S.L.J., 263 N.W.2d at 415.

11. As discussed later in our opinion, although the Supreme Court deferred to our authoritative construction of the St. Paul ordinance to punish only "fighting words," it concluded that the ordinance was facially unconstitutional because the ordinance impermissibly discriminated on the basis of content within

Based on prior decisions, including *Chaplinsky*, *S.L.J.*, and *R.A.V.*, we uphold the constitutionality of section 609.505, subdivision 2, by narrowly construing it to punish only "defamation." [12] Accordingly, we hold that to subject a person to criminal sanctions under section 609.505, subdivision 2, the State must prove that the person informed a police officer, whose responsibilities include investigating or reporting police misconduct, that another officer has committed an act of police mis-

conduct, knowing that the information is false. In addition, in order to satisfy the "of and concerning" element of defamation, the State must prove that the officer receiving the information reasonably understands the information to refer to a specific individual. [13]

Under our narrowing construction, we conclude that the only speech reached by section 609.505, subdivision 2, is defamation. [14] Because under our limit-

the category of "fighting words." *R.A.V.*, 505 U.S. at 391, 112 S.Ct. 2538.

**12.** Unlike the resolution at issue in *Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987), and the statute at issue in *Secretary of State of Maryland v. Joseph H. Munson Company, Inc.*, 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), section 609.505, subdivision 2 is susceptible to a narrowing construction. In *Board of Airport Commissioners*, the Supreme Court held that a resolution banning all "First Amendment activities" at Los Angeles International Airport was unconstitutional because it was "substantially overbroad" and "not fairly subject to a limiting construction." 482 U.S. at 570, 577, 107 S.Ct. 2568.

In *Secretary of State of Maryland*, the Supreme Court struck down a statute regulating fundraising activities because there was "no core of easily identifiable and constitutionally proscribable conduct that the statute prohibit[ed]." 467 U.S. at 965–66, 104 S.Ct. 2839. The Maryland statute at issue prohibited a charitable organization, in connection with any fundraising activity, from paying expenses of more than 25% of the amount raised, but authorized a waiver of this limitation where it would effectively prevent the organization from raising contributions. *Id.* at 950–51 & n. 2, 104 S.Ct. 2839. In holding that the statute was unconstitutional, the Supreme Court stated:

> Here there is no core of easily identifiable and constitutionally proscribable conduct that the statute prohibits. . . . The flaw in the statute is not simply that it includes within its sweep some impermissible applications, but that in all its applications it operates on a fundamentally mistaken

premise that high solicitation costs are an accurate measure of fraud.

*Id.* at 965–66, 104 S.Ct. 2839.

Unlike the resolution in *Board of Airport Commissioners* and the statute in *Secretary of State of Maryland*, section 609.505, subdivision 2 is susceptible to a narrowing construction. Although section 609.505, subdivision 2, as written, contemplates the punishment of protected speech in *some* of its applications, there is a "core of easily identifiable and constitutionally proscribable conduct"—defamation—that the statute prohibits.

**13.** The dissent erroneously asserts that we "rely on the canon of constitutional avoidance" to uphold subdivision 2. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (describing the canon of constitutional avoidance as an "interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts"). We do not claim that subdivision 2 is ambiguous. Instead, in conformity with our *S.L.J.* and *R.A.V.* decisions, as well as the Supreme Court's guidance that "[f]acial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute," *Broadrick*, 413 U.S. at 613, 93 S.Ct. 2908, we uphold the statute by limiting its application to speech constituting defamation.

**14.** The dissent argues that "subdivision 2 creates a greater risk of chilling protected speech than the now-invalidated Stolen Valor Act" because "[u]nlike the Stolen Valor Act—which regulated "easily verifiable facts"—subdivision 2 regulates false statements that are not easily or objectively verifiable" (citation omitted). But whether or not alleged

ing construction we require the State to prove that a person, in order to be convicted under the statute, has informed a peace officer of an act of police misconduct by *another* officer, the first element of defamation—communication to a third party—is fulfilled. The statute also requires the communicator of the information to know that it is false, fulfilling the second element. Because an act of misconduct is an allegation that affects a peace officer "in his business, trade, profession, office or calling" the requirement for defamation per se is satisfied. *See Bahr,* 766 N.W.2d at 920 (citation omitted) (internal quotation marks omitted). Finally, requiring the State to prove that the officer receiving the information reasonably understands the information to refer to a specific individual satisfies the fourth element.

Moreover, the mental state required for a conviction under section 609.505, subdivision 2, exceeds the actual malice standard for defamation of a public official established by the Supreme Court. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (concluding that a public official may not recover damages for "a defamatory falsehood" absent proof that the statement was made with knowledge it was false, or with reckless disregard of whether the statement was true or false); *Garrison v. Loui-*

*siana,* 379 U.S. 64, 77–78, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (applying *New York Times* standard to a criminal defamation statute). Under *New York Times* and *Garrison,* a person is exposed to liability for making a statement that he or she knew to be false, or for making a statement with reckless disregard for its truth. Under section 609.505, subdivision 2, the State must prove that a person *knew* the allegation that a peace officer committed an act of misconduct was false. Thus, section 609.505, subdivision 2, reaches only speech that is defamatory.[15]

### C.

Crawley was convicted under section 609.505, subdivision 2, before our narrowing construction of the statute. She is therefore entitled to have a jury determine whether her statements to Winona Police Department Sergeant Christopher Nelson were "of and concerning" another peace officer. *See State v. Vance,* 734 N.W.2d 650, 657 (Minn.2007) ("[D]ue process ... 'entitle[s] a criminal defendant to a jury determination that [she] is guilty of every element of the crime with which [s]he is charged, beyond a reasonable doubt.'") (quoting *Apprendi v. New Jersey,* 530 U.S. 466, 476–77, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)). We, therefore, reverse Craw-

defamatory statements contain "easily verifiable facts" has never been an element of defamation. *See Bahr,* 766 N.W.2d at 919–20; *Glenn,* 171 F.Supp.2d at 948. The dissent's distinction between the Stolen Valor Act and subdivision 2 is therefore irrelevant for purposes of our analysis.

**15.** The dissent asserts that subdivision 2 "punishes precisely the type of speech that is at the 'very center' of the First Amendment: statements critical of government officials" (quoting *Rosenblatt v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966)), and therefore "risks chilling valuable speech" (quoting *Gertz,* 418 U.S. at 342, 94 S.Ct. 2997). But because subdivision 2 requires a

heightened *mens rea*—knowingly—it does not risk "chilling" valuable speech. *See New York Times Co.,* 376 U.S. at 279, 84 S.Ct. 710; *Garrison,* 379 U.S. at 74, 85 S.Ct. 209. Furthermore, even if a person communicates a false statement about police misconduct in the privacy of one's home, or at a social club, that is later communicated to an officer whose responsibilities include investigating or reporting police misconduct, that person would not be subject to criminal liability unless he made the statements "knowing that the information is false." Subdivision 2 therefore does not risk "chilling" valuable speech.

ley's conviction and remand for a new trial based on our narrowing construction of section 609.505, subdivision 2.

## III.

Section 609.505, subdivision 2, does not pass constitutional muster based solely upon our construction that narrows the statute to defamation. Rather, we must evaluate the statute under Supreme Court precedent laying out the constitutional prohibition on content discrimination within unprotected categories of speech, and we turn now to that analysis.

## A.

█ Defamation and other categories of speech that may be restricted without violating the First Amendment are often referred to as "not within the area of constitutionally protected speech." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (quoting *Roth v. United States*, 354 U.S. 476, 483, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). These unprotected areas of speech can, "consistently within the First Amendment, be regulated *because of their constitutionally proscribable content.*" *Id.* But these unprotected categories of speech are not "invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content." *Id.* at 383–84, 112 S.Ct. 2538. Thus, the government is prohibited from discriminating on the basis of content within unprotected categories of speech unless one of the exceptions set forth in *R.A.V.* apply. *Id.* at 384, 388–90, 112 S.Ct. 2538.

Crawley argues that subdivision 2 is viewpoint-based, in addition to being content-based, because it impermissibly discriminates against "a certain class of antigovernment speech" while permitting an otherwise "similarly situated class of pro-government speech" to go unpunished. We disagree and conclude that subdivision 2 is not viewpoint-based. Speech that is supportive of peace officer conduct fails to satisfy the elements of defamation because it does not tend to harm the plaintiff's reputation and to lower the plaintiff in the estimation of the community. If the statute were to reach pro-government speech as well as defamation, the statute would punish a substantial amount of protected speech and be facially unconstitutional as overly broad. Because speech that is supportive of peace officer conduct does not fall within the unprotected category of defamation, the statute does not discriminate on the basis of viewpoint.

## B.

█ We begin with the general rule of *R.A.V.*, which is that content-based distinctions drawn within unprotected categories of speech are unconstitutional. 505 U.S. at 382, 112 S.Ct. 2538. But these content-based distinctions may survive constitutional attack if one or more specified exceptions from *R.A.V.* apply. *Id.* at 388–90, 112 S.Ct. 2538.

In *R.A.V.*, the Supreme Court considered a St. Paul ordinance that made it a misdemeanor to display a symbol, "including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others *on the basis of* race, color, creed, religion or gender." 505 U.S. at 380, 112 S.Ct. 2538 (emphasis added) (citation omitted). The Supreme Court was bound by our construction of the ordinance, limiting the ordinance to reach only "fighting words," *R.A.V.*, 505 U.S. at 381, 112 S.Ct. 2538, but nonetheless reversed, concluding that the ordinance was facially unconstitutional. *Id.* at 396, 112 S.Ct. 2538.

The focus of the Court's reasoning was on the use of the words "on the basis of race, color, creed, religion or gender," stating that it was "obvious that the symbols which will arouse 'anger, alarm or resentment in others on the basis of race, color, creed, religion or gender' are those symbols that communicate a message of hostility based on one of these characteristics." *Id.* at 393, 112 S.Ct. 2538 (citation omitted). The Court explained the constitutional problem:

> Displays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics. Those who wish to use "fighting words" in connection with other ideas—to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality—are not covered. The First Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects.

*Id.* at 391, 112 S.Ct. 2538. The Court underscored the nature of the constitutional failing of the St. Paul ordinance when it decided *Virginia v. Black*, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). In *Black*, the Court upheld a Virginia statute that banned cross burning "with the intent of intimidating any person or group of persons." 538 U.S. at 348, 362–63, 123 S.Ct. 1536 (citation omitted). In contrast with the ordinance in *R.A.V.*, the Virginia law survived scrutiny because it squarely based its prohibition on cross-burning upon intimidation—which the Court held is a type of "true threat" not protected by the First Amendment—but not upon intimidation that results from or is based on *any topic, subject, idea, or characteristic*. 538 U.S. at 360, 362, 123 S.Ct. 1536. It was the inclusion of the "on the basis of" factors that doomed the ordinance in *R.A.V. R.A.V.*, 505 U.S. at 396, 112 S.Ct.

2538; *see Black*, 538 U.S. at 362, 123 S.Ct. 1536.

By prohibiting "only a particular type of threat"—cross burning—within the broader unprotected category of "true threats," the Virginia cross-burning statute fell within the first of three exceptions to the general prohibition against content-based discrimination within unprotected categories of speech announced in *R.A.V. Black*, 538 U.S. at 362, 123 S.Ct. 1536; *R.A.V.*, 505 U.S. at 388–90, 112 S.Ct. 2538. The first exception to the *R.A.V.* prohibition can be stated as follows: when the basis for the content discrimination of a subclass "consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." *R.A.V.*, 505 U.S. at 388, 112 S.Ct. 2538. The second exception to *R.A.V.* states that a "valid basis for according differential treatment to even a content-defined subclass of proscribable speech is that the subclass happens to be associated with particular 'secondary effects' of the speech, so that the regulation is 'justified without reference to the content of the ... speech.' " *R.A.V.*, 505 U.S. at 389, 112 S.Ct. 2538 (emphasis omitted) (quoting *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)). The third *R.A.V.* exception allows distinguishing a subclass even without *identifying* "any particular 'neutral' basis, so long as the nature of the content discrimination is such that there is no realistic possibility that official suppression of ideas is afoot." *Id.* at 390, 112 S.Ct. 2538. Together, the exceptions allow content-based distinctions, within unprotected categories of speech, that pose little danger of government action eliminating or driving out ideas or viewpoints from public conversation. *Id.* at 388–90, 112 S.Ct. 2538.

Turning to this case, because we construe section 609.505, subdivision 2, to reach defamation, *R.A.V.* controls our analysis here. Subdivision 2 criminalizes a content-based subclass of defamation because it applies to defamation per se that alleges an act of misconduct implicating a peace officer, made to a specific sort of peace officer: one "whose responsibilities include investigating or reporting police misconduct." Rather than criminalizing defamation generally, subdivision 2 prohibits a subset of defamatory speech with certain content—that a peace officer committed an act of misconduct—made to a certain audience—a peace officer whose responsibilities include investigating and reporting police misconduct. Because the statute addresses a subset of defamatory speech, in order to decide whether section 609.505, subdivision 2, is constitutional, we must examine and apply the exceptions announced in *R.A.V.* 505 U.S. at 388–90, 112 S.Ct. 2538. We proceed now to those three exceptions.

### 1.

The first exception identified in *R.A.V.* is the exception that the Court applied in *Black:* when the basis for the content discrimination of a subclass "consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." 505 U.S. at 388, 112 S.Ct. 2538. As examples of this exception, in *R.A.V.* the Court described a subclass of obscenity that is prohibited because of its exceptionally prurient nature; threats against the President, which carry "special force" when compared with "true threats" against other persons; and the decision of a state to "choose to regulate price advertising in one industry but not in others, because the risk of fraud (one of the characteristics of commercial speech that justifies depriving it of full First Amendment protection) *is in its view greater there.*"

*Id.* at 388–89, 112 S.Ct. 2538 (emphasis added) (citation omitted). As contrasting examples of subclasses that would be improper, the Court pointed to an ordinance that prohibited obscene material that contained certain political messages; a prohibition on threats against the President that "mention his policy on aid to inner cities"; and a ban on commercial messages that applies only to commercial advertising "that depicts men in a demeaning fashion." *Id.*

The Court further explained and applied the first *R.A.V.* exception in *Black*, concluding that the Virginia cross-burning statute at issue validly banned a "particularly virulent form of intimidation." 538 U.S. at 363, 123 S.Ct. 1536 ("Instead of prohibiting all intimidating messages, Virginia may choose to regulate this subset of intimidating messages in light of cross burning's long and pernicious history as a signal of impending violence."). In contrast, the St. Paul ordinance in *R.A.V.* that banned the display of a burning cross or other symbols failed because of its "on the basis of" language, through which the ordinance banned "fighting words ... *that communicate messages* of racial, gender, or religious intolerance." 505 U.S. at 393–94, 112 S.Ct. 2538 (emphasis added).

Turning to the issues in this case, we conclude that section 609.505 subdivision 2, fails to meet the first *R.A.V.* exception.

The Supreme Court describes "[t]he legitimate state interest" underlying defamation as "the compensation of individuals for the harm inflicted upon them by defamatory falsehood." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Here the basis for the content discrimination of the subclass does not "consist [ ] entirely of the very reason the entire class of speech at issue is proscribable." *R.A.V.*, 505 U.S. at 388, 112 S.Ct. 2538. As discussed in

Part III(B)(2) of this opinion, the secondary effects of the statute, such as the expending of public resources to investigate false reports of misconduct and the diversion of personnel and resources from legitimate reports of crime or misconduct, provide the primary justification for the statute.

### 2.

The second exception to *R.A.V.* states that a "valid basis for according differential treatment to even a content-defined subclass of proscribable speech is that the subclass happens to be associated with particular 'secondary effects' of the speech, so that the regulation is *'justified* without reference to the content of the . . .

speech.' " *R.A.V.*, 505 U.S. at 389, 112 S.Ct. 2538 (quoting *Renton*, 475 U.S. at 48, 106 S.Ct. 925).

We note, first, that secondary-effects jurisprudence is an independent and complex area of First Amendment law that, as in *Renton*, most often applies to municipal efforts to regulate, through measures such as zoning ordinances, constitutionally-protected speech that occurs at legal businesses, such as theaters that exhibit pornographic movies or stage nude dancing.[16] *See, e.g., Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991); *Renton*, 475 U.S. 41, 106 S.Ct. 925.

Knowingly false accusations of misconduct against a peace officer have substan-

---

**16.** We also note that the examples the Court gave for the "secondary effects" exception in *R.A.V.* are not consistent with zoning ordinances applied to protected expression. For one example of this exception, the Court said that a state "could, for example, permit all *obscene* live performances except those involving minors." *R.A.V.*, 505 U.S. at 389, 112 S.Ct. 2538 (emphasis added). The Court also explained that "since words can in some circumstances violate laws directed not against speech but against conduct," there would be no First Amendment problem if "sexually derogatory 'fighting words' " were the manner in which a person violated the federal law prohibiting sexual discrimination in employment practices, or if a law prohibiting treason were violated with words. *Id.* at 389, 112 S.Ct. 2538. The Court summarized: "Where the government does not target conduct *on the basis of* its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *Id.* at 390, 112 S.Ct. 2538. What all of these examples have in common is that they are *"justified* without reference to the content of the . . . speech." *Id.* at 389, 112 S.Ct. 2538 (citations omitted) (internal quotation marks omitted).

The Supreme Court has held that direct impact on listeners cannot be a "secondary effect" within the meaning of *Renton*. *R.A.V.*, 505 U.S. at 394, 112 S.Ct. 2538. When it applied the secondary-effects exception to the

St. Paul ordinance in *R.A.V.*, the Court rejected an argument from the City of St. Paul, which had asserted that the ordinance was intended to "protect against the victimization of a person or persons who are particularly vulnerable because of their membership in a group that historically has been discriminated against," not to impact "the right of free expression of the accused." *Id.* (citation omitted) (internal quotation marks omitted). The Court rejected this approach, noting that "emotive impact of speech on its audience" and "[l]isteners' reactions" could not be " 'secondary effects' we referred to in *Renton*." *Id. Renton* dealt with municipal zoning of movie theaters that displayed pornographic films, and an ordinance that prevented such theaters from opening in areas near schools, churches, residential neighborhoods, and the like. *Renton*, 475 U.S. at 44, 106 S.Ct. 925. "The [*Renton*] ordinance *by its terms* is designed to prevent crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life, not to suppress the expression of unpopular views." *Id.* at 48, 106 S.Ct. 925 (alterations in original omitted) (emphasis added). If the City of Renton had been concerned with restricting the message or content of the pornographic films, the Court explained "it would have tried to close them or restrict their number rather than circumscribe their choice as to location." *Id.*

tial secondary effects—they may trigger the expenditure of public resources to conduct investigations of the accusations. Minn. R. 6700.2200 requires the chief law enforcement officer to "establish written procedures for the investigation and resolution of allegations of misconduct against" licensed peace officers. These procedures must "minimally specify" the "misconduct which may result in disciplinary action" and "the process by which complaints will be investigated." Minn. R. 6700.2200. Section 609.505, subdivision 2(b), which was enacted in the same law as subdivision 2(a), indicates that the statute targets recouping the cost of investigations that arise from knowingly false reports of acts of police misconduct. Act of June 2, 2005, ch. 136, § 30, 2005 Minn. Laws 901, 1138. Subdivision 2(b) *requires* a court to order "any person convicted of a violation of [subdivision 2] to make full restitution of all reasonable expenses incurred in the investigation of the false allegation unless the court makes a specific written finding that restitution would be inappropriate under the circumstances. A restitution award may not exceed $3,000." [17]

In addition, other matters requiring police time and attention may suffer as a result of investigations of knowingly false reports of police misconduct. The public resources dedicated to law enforcement agencies are already inadequate in many communities throughout the State to maintain an ideal level of order and safety. The public resources, including wasted police time, expended in investigating knowingly false reports of police misconduct would further exacerbate this problem.

Thus, the secondary effects of knowingly false accusations of peace officer misconduct—the expenditure of public resources to conduct investigations and the diversion of those resources away from other matters—justify the regulation " 'without reference to the content of the . . . speech.' " *R.A.V.*, 505 U.S. at 389, 112 S.Ct. 2538 (quoting *Renton*, 475 U.S. at 48, 106 S.Ct. 925). We thus conclude that subdivision 2 is valid under the second *R.A.V.* exception.

3.

The third *R.A.V.* exception is a general exception that allows distinguishing a subclass even without identifying "any particular 'neutral' basis, so long as the nature of the content discrimination is such that there is no realistic possibility that official suppression of ideas is afoot." *Id.* at 390, 112 S.Ct. 2538. The Court's example for the third exception was a prohibition on "only those obscene motion pictures with blue-eyed actresses." *Id.* This exception implicates, here, the question of whether a false statement of fact is, or may be, an "idea."

▮▮▮▮ The Supreme Court has made a distinction between ideas and false statements of fact:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust,

---

17. Testimony at a House committee hearing on the proposed law supports this analysis. A sponsor of the House legislation who was also a state conservation officer gave two examples of investigations from the Minnesota Department of Natural Resources: one investigation required a computer to be analyzed; another required an outside investigator to be assigned the case because of potential conflicts of interest. Each of the investigations cost the agency $5,000. *See* Hearing on H.F. 381, H. Comm. Pub. Safety Policy and Fin., 84th Minn. Leg., Feb. 15, 2005 (audio tape) (statement of Rep. Tony Cornish).

and wide-open" debate on public issues.[18]

*Gertz,* 418 U.S. at 339–40, 94 S.Ct. 2997 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Nevertheless, false statements of fact are "inevitable in free debate" and "a rule of strict liability that compels a publisher or broadcaster to guarantee the accuracy of his factual assertions may lead to intolerable self-censorship." *Id.* at 340, 94 S.Ct. 2997. But false statements of fact that can be characterized as defamation can be proscribed without running afoul of the First Amendment.[19] *See New York Times Co.,* 376 U.S. at 279–80, 84 S.Ct. 710 (concluding that a public official may not recover damages for "a defamatory falsehood" absent proof that the statement was made with knowledge it was false, or with reckless disregard of whether the statement was true or false); *Garrison,* 379 U.S. at 77–78, 85 S.Ct. 209 (applying *New York Times* standard to a criminal defamation statute).

Turning to the instant case, section 609.505, subdivision 2, criminalizes knowingly false reports of police misconduct, which are false statements of fact. As discussed in Part I of this opinion, we construe "an act of police misconduct" to mean a specific act or omission which violates a policy or rule of professional conduct, adopted by a law enforcement agency, that would expose a peace officer to discipline. In order for a person to be convicted under section 609.505, subdivision 2, he or she must knowingly report a specific act or omission by a peace officer that may subject the peace officer to disciplinary action. For instance, under the statute, a knowingly false accusation that a peace officer engaged in a specific act of illegal racial profiling may be punishable, whereas a statement that "a peace officer is a scoundrel" would never be criminal. Accordingly, we hold that section 609.505, subdivision 2, does not pose a threat of "official suppression of ideas." *R.A.V.,* 505 U.S. at 390, 112 S.Ct. 2538. We thus conclude that our construction of section 609.505, subdivision 2, meets the third *R.A.V.* exception.

4.

We note here that reliance on *Chaker v. Crogan,* 428 F.3d 1215 (9th Cir.2005), cited by Crawley and the court of appeals, is misplaced. In *Chaker,* the United States Court of Appeals for the Ninth Circuit decided that a California statute prohibiting false reports of police misconduct impermissibly discriminated on viewpoint because, while the government could prohibit false speech during misconduct investigations, it could not prohibit only false speech that implicated officers. 428 F.3d at 1227 (finding Cal.Penal Code § 148.6 unconstitutional under *R.A.V.*). *Chaker* is unpersuasive for several reasons. Most importantly, while the *Chaker* court applied the *R.A.V.* rule, it did not mention—let alone analyze—the exceptions announced by the Supreme Court. *See Chaker,* 428 F.3d at 1227–28. Moreover, in *Chaker,* the Ninth Circuit defined the unprotected speech at issue to be "know-

---

18. The Ninth Circuit also noted that "laws targeting false statements of *fact* ... are unlikely to *directly* express or relate to an identifiable viewpoint, meaning that the exception in *R.A.V.* for cases in which 'there is no realistic possibility that official suppression of *ideas* is afoot,' would probably apply." *United States v. Alvarez,* 617 F.3d 1198, 1204 n. 4 (9th Cir.2010) (citation omitted) (quoting *R.A.V.,* 505 U.S. at 390, 112 S.Ct. 2538), *aff'd,* —— U.S. ——, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012).

19. As we concluded earlier, the speech that is criminalized by section 609.505, subdivision 2, as we have narrowly construed it, falls squarely within the category of defamation.

ingly false speech"—a category that has been since questioned by federal appellate courts in more recent decisions. *Id.* at 1228; *see Alvarez,* 132 S.Ct. at 2545 (plurality opinion) ("[F]alsity alone may not suffice to bring the speech outside the First Amendment."); *281 Care Comm. v. Arneson,* 638 F.3d 621, 633–34 (8th Cir. 2011) (declining to recognize "knowingly false campaign speech" as categorically unprotected in absence of Supreme Court precedent).

## IV.

Because we construe section 609.505, subdivision 2, narrowly to reach only defamatory speech not protected by the First Amendment, and because the statute falls within two of the *R.A.V.* exceptions to the constitutional prohibition against content discrimination within a category of unprotected speech, we conclude that section 609.505, subdivision 2 is constitutional. Accordingly, we reverse the judgment of the court of appeals that the statute is unconstitutional. But because Crawley was convicted under section 609.505, subdivision 2, before our narrowing construction of the statute, we reverse her conviction and remand for a new trial.

Reversed and remanded.

Dissenting, STRAS, ANDERSON, PAUL H. and MEYER, JJ.

STRAS, Justice (dissenting).

The question presented by this case is whether Minn.Stat. § 609.505, subd. 2 (2010), is a law unconstitutionally "abridging the freedom of speech" under the First Amendment to the United States Constitution. The court concludes that subdivision 2 fully comports with the Constitution, but does so only after rewriting the statute. Construing the statute as written, I would hold that subdivision 2 is an unconstitutional content- and viewpoint-based re-

striction on core First Amendment speech. Therefore, I respectfully dissent.

## I.

In answering the constitutional question presented by this case, the first step is to determine the kind and extent of speech regulated by Minn.Stat. § 609.505, subd. 2. Subdivision 2 states as follows:

> Whoever informs, or causes information to be communicated to, a peace officer, whose responsibilities include investigating or reporting police misconduct, that a peace officer, as defined in section 626.84, subdivision 1, paragraph (c), has committed an act of police misconduct, knowing that the information is false, is guilty of a crime....

Subdivision 2 requires proof of only four elements. In order to obtain a conviction, the State must prove the defendant (1) informed or caused information to be communicated to (2) a peace officer, whose responsibilities include investigating or reporting police misconduct, (3) that a peace officer committed an act of police misconduct, (4) knowing the information communicated is false. The statute is unambiguous, and it has no other requirements.

The court largely agrees with my reading of subdivision 2. Yet, rather than applying the statutory provision as written, the court engrafts two additional elements onto subdivision 2 that are absent from the text of the statute. First, that a defendant must communicate the alleged act of police misconduct to a *different* peace officer than the officer against whom the misconduct is alleged. Second, that the officer receiving the communication must reasonably understand the communication to refer to a specific individual. The court does so to support its conclusion that subdivision 2 criminalizes only common law defamation, an unprotected category of speech

under the First Amendment. The court's analysis, however, forces a square peg in a round hole. And the court concedes as much: "the statute, *as written* . . ., fails to fulfill the first element of defamation: publication to a third person. The statute also fails to fulfill the fourth element [of defamation] because it does not require the statement to be 'of and concerning' a specific individual." (Emphasis added).

In adopting a limiting construction, the court appears to rely on the canon of constitutional avoidance, which provides that, "[w]here possible," we "should interpret a statute to preserve its constitutionality." *Hutchinson Tech., Inc. v. Comm'r of Revenue*, 698 N.W.2d 1, 18 (Minn.2005); *see also United States v. Jin Fuey Moy*, 241 U.S. 394, 401, 36 S.Ct. 658, 60 L.Ed. 1061 (1916) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score."). However, the canon of constitutional avoidance—like other canons of statutory construction—may not be used to circumvent a statute's plain meaning. *See, e.g., FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516, 129 S.Ct. 1800, 173 L.Ed.2d 738

(2009) (describing the canon of constitutional avoidance as an "interpretive tool, counseling that *ambiguous* statutory language be construed to avoid serious constitutional doubts" (emphasis added)); *George Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379, 53 S.Ct. 620, 77 L.Ed. 1265 (1933) ("[A]voidance of a [constitutional] difficulty will not be pressed to the point of disingenuous evasion.").

In this case, the court applies the canon of constitutional avoidance beyond its permissible scope by giving subdivision 2 an unreasonable construction.[1] In fact, by engrafting two additional elements onto the text of subdivision 2, the court effectively rewrites the statute. The court's decision may save the statute's constitutionality, but it does so at the expense of ignoring the actual words used by the Legislature. Under the court's application of the canon of constitutional avoidance, this court now possesses the power to preserve, solely at our discretion, statutes that would otherwise be unconstitutional, simply by adding our own limiting language. The court's approach is inconsistent with the proper, limited role of the judiciary.[2] *See Clark v. Martinez*, 543

---

1. Even if the court is correct that it is not applying the canon of constitutional avoidance to subdivision 2—a dubious proposition at best—the line of overbreadth cases relied upon by the court still require a limiting construction to be a *reasonable* interpretation of the challenged statute. *See United States v. Stevens*, —— U.S. ——, 130 S.Ct. 1577, 1591–92, 176 L.Ed.2d 435 (2010) ("[T]his court may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction. We will not rewrite a . . . law to conform it to constitutional requirements.") (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 884, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (citations omitted) (internal quotation marks omitted)).

2. The statute upheld by the court in this case scarcely resembles the statute enacted by the Legislature. The court evaluates the follow-

ing statute for its compliance with the First Amendment (with the court's alterations in italics):

> Whoever informs, or causes information to be communicated to, a peace officer, whose responsibilities include investigating or reporting police misconduct, that *another* peace officer, as defined in section 626.84, subdivision 1, paragraph (c), *who can be reasonably identified from the statement or its context*, has committed an act of police misconduct, knowing that the information is false, is guilty of a crime. . . .

It is one thing to apply a narrowing construction to an ambiguous statute with two or more reasonable constructions to avoid constitutional infirmity. But it is entirely another to add language to an otherwise unambiguous statute. As we have stated, "[i]t is the exclusive province of the [L]egislature to define by

U.S. 371, 385, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) ("The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions *as a means of choosing between them.*"); *United States v. Del. & Hudson Co.*, 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909) (prohibiting the application of the canon of constitutional avoidance when a statute is unambiguous and the unambiguous interpretation results in the unconstitutionality of the statute).

The court justifies its approach by relying primarily on two decisions of the Supreme Court of the United States. In one, the Court examined the constitutionality of a state statute regulating offensive speech, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), and in the other, the constitutionality of a municipal ordinance criminalizing bias-motivated expression, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). In answering the First Amendment questions presented in each case, the Court deferred to the limiting constructions given to those statutes by each state's highest court. *See R.A.V.*, 505 U.S. at 381, 112 S.Ct. 2538; *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. 766. It is therefore true that our construction of a state statute binds the Supreme Court. *See, e.g., Johnson v. Fankell*, 520 U.S. 911, 916, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997) ("Neither this Court nor any other federal tribunal has any authority to place a construction on a state statute different from the one rendered by the highest court of the State."). But just because the Supreme Court must defer to our interpretation of a state statute does not mean that we *should* rewrite a criminal statute to avoid a difficult constitutional question.[3] To my knowledge, the Court has never suggested that the constitutional avoidance canon permits courts to engraft two new elements onto a criminal offense. To the contrary, the Court has recognized that employing the canon to rewrite an other-

statute what acts shall constitute a crime." *State v. Forsman*, 260 N.W.2d 160, 164 (Minn. 1977). It is our job, by contrast, to interpret, apply, and evaluate criminal statutes as written, not to rewrite legislative enactments to ensure that they survive constitutional scrutiny. *See Premier Bank v. Becker Dev., LLC*, 785 N.W.2d 753, 760 (Minn.2010) (stating that our rules of construction prohibit us from adding words to a statute that "are purposely omitted or inadvertently overlooked").

**3.** The court's opinion leaves the reader with the impression that the Supreme Court has encouraged state courts to rewrite statutes to survive First Amendment scrutiny. Nothing could be further from the truth. In fact, the Supreme Court has disapproved of the practice by state courts of *rewriting*, rather than adopting a *reasonable* limiting construction of, statutes and ordinances. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *see also Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216–17 & nn. 14–15, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (concluding that an ordinance was overbroad under the First Amendment because it was not "susceptible of a narrowing construction" and any limiting construction would require "a rewriting of the ordinance"). In one such case, the Supreme Court recognized a state court's interpretation of an ordinance as binding, as it had to, but was less than convinced by the unduly narrow interpretation given to the ordinance by the Supreme Court of Alabama:

It is said, however, that no matter how constitutionally invalid the Birmingham ordinance may have been as it was written, nonetheless the authoritative construction that has now been given it by the Supreme Court of Alabama has so modified and narrowed its terms as to render it constitutionally acceptable.... [I]n affirming the petitioner's conviction in the present case, the Supreme Court of Alabama performed a remarkable job of plastic surgery upon the face of the ordinance.

*Shuttlesworth*, 394 U.S. at 153, 89 S.Ct. 935.

wise unambiguous statute constitutes "a serious invasion of the legislative domain." *United States v. Stevens,* —— U.S. ——, 130 S.Ct. 1577, 1592, 176 L.Ed.2d 435 (2010) (citation omitted) (internal quotations marks omitted); *see also United States v. Reese,* 92 U.S. 214, 221, 23 L.Ed. 563 (1875) (recognizing that judicially modifying a statute improperly substitutes "the judicial for the legislative department of the government").

In contrast to the court's approach, I would not rewrite subdivision 2 to fit into common law defamation in order to evade constitutional scrutiny. Instead, I would give the statute its plain and ordinary meaning. Accordingly, the relevant constitutional question is not whether the State may regulate defamation, but whether the State may broadly criminalize knowingly false statements regarding police misconduct.

## II.

Answering that question first requires determining the applicable standard of review. The threshold step in determining the standard of review is to decide whether the statute regulates protected or unprotected speech. If the statute regulates *protected* speech in a non-content-neutral fashion, then the court must subject the statute to strict scrutiny, which requires the State to show a compelling interest justifying the statute and that the statute is narrowly tailored to achieve that compelling interest. *See Brown v. Entm't Merchs. Ass'n,* —— U.S. ——, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011); *United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). On the other hand, if the statute regulates *unprotected* speech in a

non-content-neutral fashion—which is the conclusion the court reaches about subdivision 2—then the court must apply the framework of *R.A.V. v. City of St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), to determine the statute's constitutionality.[4]

### A.

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend I. These words are broad, categorical, and arguably absolute. Yet the Supreme Court has recognized that certain categories of speech-including "[incitement]; obscenity; defamation; speech integral to criminal conduct; so-called 'fighting words'; child pornography; fraud; true threats; and speech presenting some grave and imminent threat the government has a power to prevent"—are unprotected. *United States v. Alvarez,* —— U.S. ——, 132 S.Ct. 2537, 2544, 183 L.Ed.2d 574 (2012) (plurality opinion) (internal citations omitted); *see also United States v. Stevens,* —— U.S. ——, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010) (including a similar list). It is undisputed that subdivision 2 does not regulate expression that is "directed to inciting or producing imminent lawless action," *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), is obscene, *Roth v. United States,* 354 U.S. 476, 485, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), is integral to criminal conduct, *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 498, 69 S.Ct. 684, 93 L.Ed. 834 (1949), is fraudulent, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.,* 538 U.S. 600, 620, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003), qualifies as fighting words, *Chaplinsky v. New Hampshire,* 315

4. The other possibilities are that the statute regulates protected or unprotected speech in a content-neutral fashion, but neither the court nor the parties assert that subdivision 2 is content-neutral.

U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), is a true threat, *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam), or is speech presenting a grave and imminent threat, *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Nor, as I conclude above, is subdivision 2 limited solely to the regulation of defamatory speech.

### 1.

Subdivision 2 criminalizes knowingly false statements of fact. *See State v. Crawley*, 789 N.W.2d 899, 903 (Minn.App. 2010) (referring to the category of speech criminalized by subdivision 2 as the "intentional lie" (emphasis omitted)). The threshold constitutional question is whether such statements are categorically unprotected under the First Amendment.

In *United States v. Alvarez*, the Supreme Court answered that question, concluding that knowing falsehoods are not a separate category of unprotected speech. Specifically, the question in *Alvarez* was the constitutionality of the Stolen Valor Act, 18 U.S.C. § 704(b), (c) (2006), which made it a crime for a person to falsely claim the receipt of a military decoration or medal. *Alvarez*, 132 S.Ct. at 2542 (plurality opinion). No opinion garnered a majority of the Court, but six Justices agreed that knowing falsehoods are not categorically unprotected. *See id.* at 2546–47; *see also id.* at 2553 (Breyer, J., concurring). The plurality (authored by Justice Kennedy and joined by Chief Justice Roberts and Justices Ginsburg and Sotomayor) squarely "reject[ed] the notion that false speech should be in a general category that is presumptively unprotected." *Id.* at 2546–47 (plurality opinion). Although the Court had occasionally suggested that false statements of fact are entitled to lesser First Amendment protection, the plurality rejected a categorical

approach because "some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation." *Id.* at 2544. To hold otherwise, the plurality explained, "would endorse government authority to compile a list of subjects about which false statements are punishable." *Id.* at 2547. Such broad and far-reaching governmental power would have "no clear limiting principle," resembling Oceania's Ministry of Truth from George Orwell's *1984. Id.*

The opinion concurring in the judgment (authored by Justice Breyer and joined by Justice Kagan), which is arguably the binding rationale of *Alvarez*, largely eschewed a "strict categorical analysis." *Id.* at 2551 (Breyer, J., concurring); *see also Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . ." (citation omitted) (internal quotation marks omitted)). Yet the reasoning of Justice Breyer's concurring opinion makes clear that knowing falsehoods are entitled to First Amendment protection. Indeed, the concurrence explained that the Court's prior statements on the lesser First Amendment value of false statements could not be read to "mean no protection at all" because such statements can "serve useful human objectives" in social, public, technical, philosophical, and scientific contexts. *Alvarez*, 132 S.Ct. at 2553 (internal quotation marks omitted). Moreover, in applying intermediate scrutiny rather than the *R.A.V.* framework applicable to categorically unprotected speech, the concurrence necessarily concluded that false statements are entitled to some First Amendment protection. *See*

*id.* at 2552 (applying intermediate scrutiny in reviewing the Stolen Valor Act); *see also infra* n. 6 (discussing Justice Breyer's application of intermediate scrutiny in *Alvarez* ).

Accordingly, we are bound by the conclusion of a majority of Justices in *Alvarez* that knowing falsehoods are not categorically unprotected under the First Amendment. *See State v. Brist,* 812 N.W.2d 51, 54 (Minn.2012) ("Supreme Court precedent on matters of federal law, including the interpretation and application of the United States Constitution, is binding on this court.").

### 2.

Moreover, even if some of the speech criminalized by Minn.Stat. § 609.505, subd. 2, is constitutionally unprotected, the statute nevertheless risks First Amendment harm because it has a "chilling effect" on other, more valuable protected speech. *Phila. Newspapers, Inc. v. Hepps,* 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *see also Alvarez,* 132 S.Ct. at 2553 (Breyer, J., concurring) (discussing the need for "breathing room" for more valuable speech); *id.* at 2563 (Alito, J., dissenting) (explaining the need to "extend a measure of strategic protection [to unprotected speech] in order to ensure sufficient breathing space for protected speech" (citation omitted) (internal quotation marks omitted)). Put differently, subdivision 2 regulates within an area of expression that lies at the heart of the First Amendment—speech that is critical of the government—and fails to provide sufficient " 'breathing space' " to core, protected expression. *Hepps,* 475 U.S. at 778, 106 S.Ct. 1558 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 272, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

As the Supreme Court has recognized, an animating principle of the First Amendment was to limit the government's ability to suppress dissident and minority expression. *See Roth,* 354 U.S. at 484, 77 S.Ct. 1304; *see also Citizens United v. FEC,* 558 U.S. 310, 130 S.Ct. 876, 898, 175 L.Ed.2d 753 (2010) ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints."). Substantial historical evidence also supports the view that, at the time the First Amendment was ratified, the public understood the freedom of speech and the freedom of the press to encompass an unrestrained right of free discussion of government affairs and public officials. *See* Zechariah Chafee, *Free Speech in the United States* 19 (1941); *see also Burson v. Freeman,* 504 U.S. 191, 196, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (plurality opinion) (" '[T]here is practically universal agreement that a major purpose of th[e] [First] Amendment was to protect the free discussion of governmental affairs.' " (quoting *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966))).

Commentators have observed that the First Amendment was responsive in part to the law of seditious libel, as developed by the English Court of the Star Chamber, which made it a crime for citizens to publish or make comments that were critical of the King. *See* Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 11.1.1, at 923 (3d ed.2006); Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 342–43 (1868). Truth was not a defense to a charge of seditious libel. In fact, the more truth associated with the libelous statement, the greater the libel and the harm to the government. *See* John E. Nowak & Ronald Rotunda, *Constitutional Law* § 16.3, at 1266 (8th ed.2010). Based on that history, one commentator observed that the First Amend-

ment was ratified in part "to wipe out the common law of sedition, and make further prosecutions for criticism of the government, without any incitement to law-breaking, forever impossible in the United States of America." Chafee, *supra,* at 21; *see also Beauharnais v. Illinois,* 343 U.S. 250, 272, 72 S.Ct. 725, 96 L.Ed. 919 (1952) (Black, J., dissenting) ("[T]he First Amendment repudiated seditious libel for this country.").

Professor Chafee's account of the First Amendment is arguably in tension with the Sedition Act of 1798, which Congress passed just 7 years after the First Amendment's ratification. The Sedition Act criminalized the publication of "false, scandalous and malicious writing or writings against the government of the United States, or either house of the Congress of the United States, or the President of the United States, with intent to defame ... or to bring them ... into contempt or disrepute." Sedition Act of 1798, ch. 74, 1 Stat. 596. Following its passage, however, the Act met widespread, vociferous opposition—including by Thomas Jefferson and First Amendment drafter James Madison—"reflect[ing] a broad consensus that the Act, because of the restraint it imposed upon criticism of government and public officials, was inconsistent with the First Amendment." *New York Times Co.,* 376 U.S. at 276, 84 S.Ct. 710; *see also id.* at 274, 84 S.Ct. 710 (noting that the *Virginia Resolutions of 1798,* drafted by Madison and adopted by the General Assembly of Virginia, protested that the Act was "levelled against the right of freely examining public characters and measures, and of free communication among the people thereon, which has ever been justly deemed the only effectual guardian of every other right" (citation omitted)). Indeed, Congress later repaid fines levied in the prosecution of the Sedition Act on the ground that the Act itself was unconstitu-

tional. *See id.* at 276, 84 S.Ct. 710 (citing Act of July 4, 1840, c. 45, 6 Stat. 802, accompanied by H.R.Rep. No. 86, 26th Cong., 1st Sess. (1840)). The Court therefore declared in *New York Times* that, "[a]lthough the Sedition Act was never tested in [the Supreme] Court, the attack upon its validity has carried the day in the court of history." *Id.*

The point of the foregoing discussion is not to conclusively resolve the historical debate over the primary motivation animating the ratification of the First Amendment, but rather to highlight the indisputable principle that criticism of the government—and those who run it—is at the core of the First Amendment. The Supreme Court has recognized as much: "[c]riticism of government is at the very center of the constitutionally protected area of free discussion[, and] [c]riticism of those responsible for government operations must be free, lest criticism of government itself be penalized." *Rosenblatt v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). Put differently, "[i]t is vital to our form of government that citizens and press alike be free to discuss and, if they see fit, impugn the motives of public officials." *Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1305 (8th Cir.1986); *see also Snyder v. Phelps,* — U.S. —, 131 S.Ct. 1207, 1215, 179 L.Ed.2d 172 (2011) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." (citation omitted)). The statute at issue here, Minn. Stat. § 609.505, subd. 2, punishes precisely the type of speech that is at the "very center" of the First Amendment: statements critical of government officials—in this case, peace officers. *Cf. Gray v. Udevitz,* 656 F.2d 588, 591 (10th Cir.1981) (collecting cases holding that police officers are considered public officials under the First Amendment).

Because subdivision 2 regulates within an area of core First Amendment expression, it risks chilling valuable speech unless it provides sufficient breathing space to prevent self-censorship or suppression. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). That is, in order to prevent the chilling of truthful speech on a matter of public concern—police misconduct—subdivision 2 must contain either "[e]xacting proof requirements," *Madigan*, 538 U.S. at 620, 123 S.Ct. 1829, such as a heightened *mens rea*, *New York Times Co.*, 376 U.S. at 279–80, 84 S.Ct. 710; a showing of specific harm, *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 539–41, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987); or a showing of materiality, *United States v. Lepowitch*, 318 U.S. 702, 704, 63 S.Ct. 914, 87 L.Ed. 1091 (1943); or contain some other "limitations of context" that help to ensure that "the statute does not allow its threat of . . . criminal punishment to roam at large," *Alvarez*, 132 S.Ct. at 2555 (Breyer, J., concurring). Given the breadth and practical application of subdivision 2, the statute fails to provide sufficient breathing space for core First Amendment speech.

The key risk posed by subdivision 2—a criminal statute—is that legitimate, truthful criticism of public officials will be suppressed for fear of unwarranted prosecution. "[E]ven minor punishments can chill protected speech." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002); *see also Alexander v. United States*, 509 U.S. 544, 565, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993) (Kennedy, J., dissenting) ("There can be little doubt that regulation and punishment of certain classes of unprotected speech have implications for other speech that is close to the proscribed line, speech which is entitled to the protections of the First Amendment."). Thus, the mere threat of prosecution may cause some would-be government critics to refrain from voicing their legitimate criticism, "because of doubt whether [their statement] can be proved in court or fear of the expense of having to do so." *New York Times Co.*, 376 U.S. at 279, 84 S.Ct. 710; *cf.* James Madison, *Report on the Virginia Resolutions, Jan. 1800*, in 5 *The Founders' Constitution* 141, 145 (Philip B. Kurland & Ralph Lerner, eds., 1987) ("[W]here simple and naked facts alone are in question, there is sufficient difficulty in some cases, and sufficient trouble and vexation in all, of meeting a prosecution from the Government with the full and formal proof necessary in a court of law.").

To be sure, subdivision 2's scienter requirement—that the defendant must *know* that the statement of police misconduct is false—reduces the risk that a person would suppress a truthful report of police misconduct. But, as the Court has explained, the threat of criminal punishment creates a strong chilling effect, and a scienter requirement may be an insufficient "antidote to the inducement to . . . self-censorship." *Gertz*, 418 U.S. at 342, 94 S.Ct. 2997. In *Alvarez*, for example, the Court invalidated the Stolen Valor Act on the ground that there was an unreasonable risk of chilling that was "not completely eliminated" by the statute's heightened scienter requirement because "a speaker might still be worried about being *prosecuted* for a careless false statement." *Alvarez*, 132 S.Ct. at 2555 (Breyer, J., concurring) (emphasis in original); *see also id.* at 2545 (plurality opinion) (explaining that the First Amendment scienter requirement in defamation and fraud cases should not be relied upon to restrict speech; instead, it "exists to allow more speech, not less"). In particular, Justice Breyer was concerned about the potentially far-reaching applicability of the Stolen Valor Act, which criminalized lies told in "family, so-

cial, or other private contexts," where little harm would result, and in political contexts, where the risk of selective prosecution is high. *Id.* at 2555 (Breyer, J., concurring).

Like the Stolen Valor Act, the potentially far-reaching applicability of Minn.Stat. § 609.505, subd. 2, risks significant First Amendment harm. Subdivision 2 authorizes punishment not only for a person who directly reports police misconduct, but also for a person who *"causes information* [that a peace officer has committed an act of police misconduct] *to be communicated to* [ ] a peace officer." Minn.Stat. § 609.505, subd. 2 (emphasis added). The required mental state for "caus[ing] information to be communicated to a peace officer" is not before us in this case, but a privately spoken or written statement could subject a speaker to punishment under subdivision 2. In fact, under subdivision 2's plain language, a speaker who merely repeats a false report of police misconduct told to him by a friend or family member may be subject to prosecution if the statement is later communicated to an officer whose responsibilities include investigating or reporting police misconduct. Put differently, subdivision 2 does not require a person to communicate the false statement directly to a peace officer, which means that a false statement about police misconduct made on the news, in the privacy of one's home, or at a social club could potentially subject a person to criminal liability. Subdivision 2 is therefore similar to the type of far-reaching regulation of speech that the Court struck down in *Alvarez*. *See Alvarez*, 132 S.Ct. at 2547 (plurality opinion) ("The statute seeks to control and suppress all false statements on this one subject in almost limitless times and settings."); *id.* at 2555 (Breyer, J., concurring) (explaining that the Stolen Valor Act did not have "limiting features"

and criminalized speech in a wide variety of contexts).

In fact, subdivision 2 creates a greater risk of chilling protected speech than the now-invalidated Stolen Valor Act. Unlike the Stolen Valor Act—which regulated "easily verifiable facts," *Alvarez*, 132 S.Ct. at 2552 (Breyer, J., concurring)—subdivision 2 regulates false statements that are not easily or objectively verifiable. The government can readily verify the receipt (or non-receipt) of a military honor or medal, but resolution of a report of police misconduct is far more complicated and will often turn on disputed and objectively *un*verifiable facts. In such circumstances, subdivision 2 may cause some complainants to decide that the risk associated with criminal prosecution outweighs the benefit of speaking out against police misconduct, particularly when a speaker justifiably is concerned about "being *prosecuted* for a careless false statement, even if he does not have the intent required to render him liable." *Alvarez*, 132 S.Ct. at 2555 (Breyer, J., concurring). Thus, subdivision 2 creates exactly the type of chilling effect that the First Amendment guards against: a danger that a potential complainant will suppress a statement, believed to be true, for fear that the statement will later be proven false. *See Alvarez*, 132 S.Ct. at 2553 (Breyer, J., concurring) (noting that a criminal statute must provide sufficient breathing space by "reducing an honest speaker's fear that he may accidentally incur liability for speaking").

Finally, even the three dissenters in *Alvarez* (Justices Alito, Scalia, and Thomas) likely would be skeptical about the constitutionality of subdivision 2. The *Alvarez* dissent recognized that "there are broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech." *Alvarez*,

132 S.Ct. at 2564 (Alito, J., dissenting). For instance, laws regulating false expression near the core of the First Amendment—such as "false statements about philosophy, religion, history, the social sciences, the arts, and *other matters of public concern*"—would threaten the chilling "of other, valuable speech." *Id.* (emphasis added). Hence, even the *Alvarez* dissenters acknowledged that false speech on matters of public concern is entitled to protection under the First Amendment.[5] *Id.; cf. Snyder*, 131 S.Ct. at 1219 (setting aside a jury verdict finding tort liability because the hate speech at issue was on a matter of public concern). As the dissent succinctly stated, "it is perilous to permit the state to be the arbiter of truth." *Alvarez*, 132 S.Ct. at 2564.

### B.

Having concluded that the speech regulated by Minn.Stat. § 609.505, subd. 2, is entitled to protection under the First Amendment, the next question is whether subdivision 2 is a content-based or content-neutral regulation of speech. If the statute regulates speech based on content, then it is unconstitutional unless it survives strict scrutiny. *See Playboy Entm't Grp., Inc.*, 529 U.S. at 813, 120 S.Ct. 1878. On the other hand, "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny." *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

A statute regulates content when it "singles out speech of a particular content and seeks to prevent its dissemination completely." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). I agree with the court that subdivision 2 is a content-based restriction on speech because criminality under the statute turns *entirely* on the subject matter of the speech. The statute does not apply broadly across all categories of false speech. To

---

5. The strongest argument in favor of the constitutionality of subdivision 2 is that each of the opinions in *Alvarez* discussed the potential constitutionality of 18 U.S.C. § 1001 (2006), which makes it a federal crime to "knowingly and willfully" make any "materially false, fictitious, or fraudulent statement or representation" in "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." *See Alvarez*, 132 S.Ct. at 2546 (plurality opinion); *id.* at 2554 (Breyer, J., concurring); *id.* at 2561 (Alito, J., dissenting). Even so, *Alvarez*'s discussion of section 1001 does not lead to a conclusion that subdivision 2 is constitutional. First, none of the opinions explicitly assert that section 1001 passes First Amendment scrutiny. Rather, Justice Breyer's concurring opinion in *Alvarez* merely discusses the differences between section 1001 and the Stolen Valor Act, while the plurality and the dissent *assume* the constitutionality of section 1001 in analyzing the constitutionality of the Stolen Valor Act. *See Alvarez*, 132 S.Ct. at 2540 (plurality opinion) (rejecting the government's argument that the assumed constitutionality of section 1001 "lead[s] to the broader proposition that false statements are unprotected when made to any person, at any time, in any context"); *id.* at 2554 (Breyer, J., concurring) (discussing the fact that section 1001 includes harm and materiality requirements, but rendering no opinion on the constitutionality of the statute); *id.* at 2561 (Alito, J., dissenting) (assuming the constitutionality of section 1001). Second, by its terms, section 1001 is limited to "materially" false and fraudulent statements, a limitation not present in subdivision 2. *See id.* at 2554 (Breyer, J., concurring) (discussing the importance of section 1001's materiality requirement). Third, section 1001 regulates all materially false and fraudulent statements made to government officials within the jurisdiction of the executive, legislative, or judicial branches, no matter the content of the statements or the viewpoints that are expressed. In contrast, subdivision 2 is a content-based regulation that is viewpoint discriminatory. *See infra* Parts II.B, IV.

the contrary, it singles out false speech with particular content: false speech communicating police misconduct. *See also Republican Party of Minn. v. White*, 536 U.S. 765, 774, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (stating that a provision in the Minnesota Code of Judicial Conduct preventing judicial candidates from announcing their views on disputed political or legal issues was a content-based restriction on speech). For that reason, I would conclude that subdivision 2 is a content-based restriction on speech, and is therefore unconstitutional unless it can survive strict scrutiny.[6] *See Playboy Entm't Grp., Inc.*, 529 U.S. at 813, 120 S.Ct. 1878.

### III.

Strict scrutiny is a "demanding standard." *Brown v. Entm't Merchs. Ass'n*, — U.S. —, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011). It requires the State to prove that Minn.Stat. § 609.505, subd. 2, furthers a compelling government interest and is narrowly tailored to achieve that interest. *See Citizens United v. FEC*, 558 U.S. 310, 130 S.Ct. 876, 898, 175 L.Ed.2d 753 (2010).

The State asserts that the sole purpose of subdivision 2 is to "reduce the adverse impact on public safety occasioned by the diversion of investigative resources away from resolving legitimate complaints." The State's interest in preventing the unwarranted expenditure or diversion of valuable public resources is no doubt a legitimate government interest, and may even be a compelling one. But even assuming that subdivision 2 furthers a compelling government interest, the statute is unconstitutional because it is not narrowly tailored. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 395–96, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

First, subdivision 2 is unnecessarily *overinclusive;* the statute punishes more speech than is necessary to further the statute's asserted justification. *See Brown*, 131 S.Ct. at 2741 (invalidating an overinclusive statute as incompatible with the narrow tailoring required by strict scrutiny). Subdivision 2 proscribes *all* knowingly false statements about police misconduct that are communicated to a peace officer whose responsibilities include investigating complaints of police misconduct, even if the statements at issue do not cause the government to divert *any* investigative resources. Put differently, even those false police reports that are palpably

---

**6.** In *Alvarez*, Justice Breyer analyzed the Stolen Valor Act under "intermediate scrutiny," which requires a proportional "fit" between the government interest and the restriction on speech. 132 S.Ct. at 2551–52 (Breyer, J., concurring) (citing *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). Nonetheless, intermediate scrutiny is inapplicable here for two reasons. First, Justice Breyer's concurring opinion does not reject the Court's longstanding rule that content-based regulations of speech are subject to strict scrutiny. Instead, Justice Breyer applied intermediate scrutiny without addressing whether the Stolen Valor Act was a content-discriminatory regulation. Even if Justice Breyer's opinion had garnered the five or more votes necessary to constitute a majority opinion, we cannot assume that the Court has abandoned its content-based/content-neutral distinction *sub silentio*. *See Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (explaining that the Supreme Court does not implicitly overrule its own precedent, even when five or more Justices express doubt about the precedent in question). Second, Justice Breyer, like the dissenters in *Alvarez*, concluded that when the government regulates speech at or near the core of the First Amendment, strict scrutiny applies to laws regulating false statements. *See Alvarez*, 132 S.Ct. at 2552 (Breyer, J., concurring). As I conclude in Part II.A.2, *supra*, subdivision 2 regulates speech at the core of the First Amendment: statements critical of the government and government officials.

untrue, and do not result in an expenditure of public resources, would violate subdivision 2. As a result, subdivision 2 is an overly broad solution for a narrow problem.

Second, subdivision 2 is unnecessarily *underinclusive*. *See id.* at 2740 (invalidating a statute regulating violent video games based in part on its underinclusiveness); *City of Ladue v. Gilleo*, 512 U.S. 43, 51, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) ("[A] regulation of speech may be impermissibly underinclusive." (emphasis omitted)). Subdivision 2 is underinclusive because it singles out and discriminates against speech based on its content. When the government passes a statute discriminating against the content of certain types of speech, the existence of less discriminatory alternatives "undercut[s] significantly" the government's defense of the statute. *Boos v. Barry*, 485 U.S. 312, 329, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988).

Accordingly, subdivision 2 can survive strict scrutiny only if the State is able to demonstrate that its decision to single out false statements regarding the misconduct of peace officers is "actually necessary" to achieve its asserted compelling interest. *Brown*, 131 S.Ct. at 2738. The State argues that "[t]here are no adequate content-neutral alternatives for deterring the needless diversion of public safety resources to investigate false reports of crimes." The State's argument falls flat because less discriminatory alternatives already exist. For example, Minn.Stat. § 609.505, subd. 1 (2010), prohibits any person from providing knowingly false information regarding the conduct of others

to an on-duty peace officer.[7] The State does not explain how subdivision 1—which prohibits *all* knowingly false statements regarding the conduct of others—fails to advance the State's interest in preventing the unwarranted diversion of investigative resources. Further, the State could reduce the adverse impact of false reports of police misconduct by punishing truly defamatory statements under Minn.Stat. § 609.765 (2010), which *actually* prohibits criminal defamation. The "dispositive question" here is whether subdivision 2's content discrimination is "reasonably necessary to achieve [the State's] compelling interests; it plainly is not." *R.A.V.*, 505 U.S. at 395, 112 S.Ct. 2538. A statute "not limited to the [dis]favored topics ... would have precisely the same beneficial effect." *Id.* at 396, 112 S.Ct. 2538. Therefore, subdivision 2 fails strict scrutiny.

### IV.

Subdivision 2 also fails to survive constitutional scrutiny because, as the court of appeals observed, the statute is viewpoint discriminatory. *State v. Crawley*, 789 N.W.2d 899, 905 (Minn.App.2010). Indeed, regardless of whether subdivision 2 regulates defamatory speech or knowingly false statements, subdivision 2 is unconstitutional because it is viewpoint discriminatory. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (explaining that viewpoint discrimination "is presumed impermissible"); *see also Morse v. Frederick*, 551 U.S. 393, 436, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (Stevens, J., dissenting) (stating that a viewpoint-dis-

---

7. Minn.Stat. § 609.505, subd. 1, provides:
   Whoever informs a law enforcement officer that a crime has been committed or otherwise provides information to an on-duty peace officer, knowing that the person is a peace officer, regarding the conduct of oth-

   ers, knowing that it is false and intending that the officer shall act in reliance upon it, is guilty of a misdemeanor. A person who is convicted a second or subsequent time under this section is guilty of a gross misdemeanor.

criminatory statute is "presumed to be unconstitutional" (citation omitted)).

Viewpoint discrimination represents a particularly "egregious" form of content discrimination. *Gen. Media Commc'ns, Inc. v. Cohen,* 131 F.3d 273, 281 (2d Cir. 1997) (citation omitted) (internal quotation marks omitted). When the government engages in viewpoint discrimination, it goes beyond mere regulation of subject matter and regulates speech based upon the particular position or point of view that the speaker wishes to express. *See Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510. Absent compelling justification, punishment of speech based on the speaker's point of view is a "blatant" violation of the First Amendment. *Id.* at 829, 115 S.Ct. 2510; *see Morse,* 551 U.S. at 436, 127 S.Ct. 2618 (Stevens J., dissenting) ("[C]ensorship that depends on the viewpoint of the speaker[ ] is subject to the most rigorous burden of justification.").

An example of viewpoint-discriminatory speech regulation occurred in *R.A.V.,* a case in which the Supreme Court examined a St. Paul ordinance that targeted "fighting words" that the speaker "knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." 505 U.S. at 380, 112 S.Ct. 2538. The Court held the ordinance facially unconstitutional because it was content- and viewpoint-discriminatory, and it failed strict scrutiny. In explaining why the challenged law was viewpoint discriminatory, the Court observed that the law selectively targeted certain racist, sexist, and anti-religious speech for punishment, and, as a result, effectively handicapped only one side of the debate on any number of issues:

[Under the St. Paul ordinance,] "fighting words" that do not themselves invoke race, color, creed, religion, or gender—aspersions upon a person's mother, for example—would seemingly be usable *ad libitum* in the placards of those arguing *in favor* of racial, color, etc., tolerance and equality, but could not be used by those speakers' opponents. One could hold up a sign saying, for example, that all "anti—Catholic bigots" are misbegotten; but not that all "papists" are, for that would insult and provoke violence "on the basis of religion." St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.

*Id.* at 391–92, 112 S.Ct. 2538.

The Supreme Court once again addressed viewpoint discrimination in *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). In that case, the Court examined the constitutionality of a New York law permitting school boards to adopt regulations for the use of school property when school was not in session. *Lamb's Chapel,* 508 U.S. at 386, 113 S.Ct. 2141. Pursuant to the law, the school board authorized the use of school property for social, civic, or recreational uses, and for use by political organizations. *Id.* at 387, 113 S.Ct. 2141. However, the board prohibited use of the school by a religious congregation to show a six-part film series containing lectures by Dr. James Dobson regarding Christianity and family values. *Id.* at 387–88, 113 S.Ct. 2141. Even though the school board's policy applied to all religious organizations equally, the Court struck down the statute as viewpoint discriminatory. *Id.* at 393, 113 S.Ct. 2141. The problem, the Court stated, was that other films about family values shown by social, civic, or recreational organizations were permissible under the school board's policy, while the policy prohibited a religious organization's at-

tempt to show a film on that topic. *Id.* at 393–94, 113 S.Ct. 2141. The policy therefore discriminated against religious viewpoints about family values. The rule that emerged from the case was that "the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Id.* at 394, 113 S.Ct. 2141 (quoting *City Council of L.A. v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)).

Like the law in *R.A.V.* and the policy in *Lamb's Chapel,* subdivision 2 discriminates based on the viewpoint of the speaker. It criminalizes speech on only one side of the issue of police misconduct: speech that is critical of the conduct of peace officers. It does not prohibit, for example, a third party from using false statements of fact to impugn the credibility of a complainant alleging police misconduct. Nor does it prohibit any party from communicating a false statement of fact supportive of a peace officer. To state the issue differently, the State can prosecute an individual under subdivision 2 for holding a sign at a rally against police brutality falsely stating that "Officer A beat me when I was arrested," but the State cannot prosecute someone for holding a sign falsely stating that "Officer A has never beat a suspect." Subdivision 2 targets for punishment only those false statements of fact that are critical of the government; false factual statements seeking to absolve a police officer or impugn a complainant "would seemingly be useable *ad libitum.*" *R.A.V.,* 505 U.S. at 391, 112 S.Ct. 2538; *see also Chaker v. Crogan,* 428 F.3d 1215, 1228 (9th Cir.2005) (concluding that a similar, but more narrowly drafted, California statute criminalizing false complaints about police misconduct constituted unconstitutional viewpoint discrimination).

Subdivision 2, however, is even more problematic than the laws at issue in *R.A.V.* and *Lamb's Chapel* because the particular viewpoint that is targeted here by subdivision 2—anti-government sentiment—is at the core of the First Amendment. *See supra* Part II.A.2. Individuals who report police misconduct are directly criticizing a public official, typically in relation to the exercise of the official's public functions and duties. "Suspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government," *Ridley v. Mass. Bay Transp. Auth.,* 390 F.3d 65, 86 (1st Cir.2004), because "[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures," *Baumgartner v. United States,* 322 U.S. 665, 673–74, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944). *Cf. Schacht v. United States,* 398 U.S. 58, 63, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970) ("[A statute] which leaves Americans free to praise the war in Vietnam but can send persons like Schacht to prison for opposing it, cannot survive in a country which has the First Amendment.").

Some commentators have observed that viewpoint-discriminatory laws regulating protected areas of speech may be per se unconstitutional. 1 Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech* § 3.11, at 3–14 to 3–15 (3d ed.1996). Indeed, in *Rosenberger,* 515 U.S. 819, 115 S.Ct. 2510, and *Lamb's Chapel,* 508 U.S. 384, 113 S.Ct. 2141, the Court invalidated viewpoint-discriminatory laws without analyzing them under strict scrutiny. In this case, I do not need to resolve the uncertainty over the applicable test for viewpoint-discriminatory laws because subdivision 2 fails strict scrutiny. *See supra* Part III. And, in any event, regardless of whether viewpoint-discriminatory laws must be analyzed under strict scrutiny, it is undisputed that viewpoint discrimination targeting criticism of the government is

exactly the type of regulation of speech that the First Amendment forbids. Accordingly, subdivision 2 is unconstitutional regardless of the test applicable to viewpoint-discriminatory laws under the First Amendment.

### V.

For the foregoing reasons, I would hold that subdivision 2 is an unconstitutional restriction on the freedom of speech under the First Amendment to the United States Constitution. I would therefore affirm the court of appeals, reverse Crawley's conviction under Minn.Stat. § 609.505, subd. 2, and remand to the district court for conviction and sentencing on the lesser-included offense under Minn.Stat. § 609.505, subd. 1.

ANDERSON, Paul H. (dissenting).

I join in the dissent of Justice Stras.

MEYER, Justice (dissenting).

I join in the dissent of Justice Stras.